**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In Re:

TIMOTHY A. TADLOCK, SR.,                       Bankruptcy Case No. 3:09-bk-7212-PMG
                                                                  Adversary Case No. 3:10-ap-64-PMG

          Debtor.

_____

ENTERPRISE MAINTENANCE
AND CONTRACTING, INC.,

          Appellant,

v.                                                                        Case No. 3:12-cv-828-J-34

TIMOTHY A. TADLOCK, SR.,

          Appellee.

_____/

## ORDER

      **THIS CAUSE** is before the Court on appeal from the United States Bankruptcy Court

for the Middle District of Florida.  Appellant, Enterprise Maintenance and Contracting, Inc.

(EMC or Appellant), seeks review of the bankruptcy court's Findings of Fact, Conclusions

of Law, and Memorandum Opinion (Doc. No. 1-3; Opinion) and Final Judgment (Doc. No.

1-4; Judgment), entered against it and in favor of Appellee, Timothy Tadlock (Tadlock or

Appellee) on March 22, 2012.  See Notice of Appeal (Doc. No. 1-1; Notice).  On September

14, 2012, EMC filed its initial brief, see Appellant's Initial Breif [sic] on Appeal (Doc. No. 6),

and later, with leave of Court (Doc. No. 11), filed Appellant's (Corrective) Initial Brief on

Appeal (Doc. No. 12; Initial Brief).  Tadlock filed an answer brief on November 5, 2012, see

Answer Brief of Appellee (Doc. No. 16; Answer Brief), and EMC filed a reply on December

4, 2012, see Appellant's Reply Brief (Doc. No. 19; Reply Brief).   Thereafter, following

EMC's failure to comply with two separate orders to show cause, the Court dismissed the

appeal.  See Order (Doc. No. 26).   However, on EMC's motion for reconsideration, see

Appellant's Motion to Reinstate Appeal (Doc. No. 27; Motion to Reinstate), the Court held

a hearing on the matter, granted the Motion to Reinstate, and took the appeal under

advisement.  See Clerk's Minutes (Doc. No. 40).  Also before the Court is Tadlock's Motion

for Damages and Costs for Frivolous Appeal (Doc. No. 17; Motion) filed on November 5,

2012.  EMC did not file a timely response to the Motion, but filed a belated response shortly

after filing the Motion to Reinstate on March 7, 2013.  See Response in Opposition to

Motion for Damages and Costs for Frivolous Appeal (Doc. No. 29; Response).[1]  Therefore,

both the appeal and the Motion are ripe for review.

## I.      Standard of Review

This Court has jurisdiction to hear an appeal from a final judgment entered by the

United States Bankruptcy Court.  See 28 U.S.C. § 158(a).  In functioning as an appellate

court, the Court reviews de novo the legal conclusions of a bankruptcy court but must

accept a bankruptcy court's factual findings unless they are clearly erroneous.  See In re

JLJ Inc., 988 F.2d 1112, 1116 (11th Cir. 1993).  "A finding [of fact] is 'clearly erroneous'

when although there is evidence to support it, the reviewing court on the entire evidence

is left with the definite and firm conviction that a mistake has been committed."  United

---

[1]      Tadlock moved to strike the Response as untimely, see Appellee's Motion to Strike
Appellant's Response in Opposition to Motion for Damages and Costs for Frivolous Appeal (Doc. No. 30);
however, the Court denied the motion to strike, deciding to consider the merits of the Motion and
Response accordingly.

2

States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).  Rule 8013 of the Federal Rules of

Bankruptcy Procedure (Rule(s)) further instructs district courts to give due regard "to the

opportunity of the bankruptcy court to judge the credibility of the witnesses."  This is

because "only the trial judge can be aware of the variations in demeanor and tone of voice

that bear so heavily on the listener's understanding of and belief in what is said." Anderson

v. City of Bessemer City, 470 U.S. 564, 575 (1985) (discussing clearly erroneous standard

under the Federal Rules of Civil Procedure).  Accordingly, "when a trial judge's finding is

based on his decision to credit one of two or more witnesses, each of whom has told a

coherent and facially plausible story that is not contradicted by extrinsic evidence, that

finding, if not internally inconsistent, can virtually never be clear error." Id.  In addition, on

appellate review the Court may not make independent factual findings. See In re JLJ Inc.,

988 F.2d at 1116; In re Englander, 95 F.3d 1028, 1030 (11th Cir. 1996).  Accordingly, "[i]f

the bankruptcy court is silent or ambiguous as to an outcome determinative factual

question, the case must be remanded to the bankruptcy court for the necessary factual

findings."  In re JLJ Ind., 988 F.2d at 1116.

## II.    Proceedings Before the Bankruptcy Court

On August 27, 2009, Tadlock filed his voluntary petition for relief under Chapter 11

of the Bankruptcy Code.  See Joint Stipulation of Facts (Doc. No. 1-8; Stipulation) ¶ 34;

Joint Exhibit 27.  Thereafter, on his motion, the bankruptcy court converted his case to one

brought pursuant to Chapter 7 of the Bankruptcy Code.  See Stipulation ¶ 37; Joint Exhibit

30.  On February 8, 2010, EMC initiated an adversary proceeding in the bankruptcy court

by filing its Adversary Complaint for Non Dischargeability of Debt (Bankr. Doc. No. 1;

Complaint) against Tadlock, seeking a determination that a debt in the amount of $988,460.00 allegedly owed by Tadlock to EMC was nondischargeable pursuant to §§ 523(a)(2) and 523(a)(4) of the Bankruptcy Code. <u>See</u> Bankruptcy Docket Sheet (Doc. No. 1-5); Opinion at 1, 4; <u>see</u> Complaint at 5-7.[2]  The bankruptcy court held an evidentiary hearing on the matter, <u>see</u> Transcript of Proceedings (Doc. No. 1-7; Transcript),[3] and following that hearing issued its Opinion and entered Judgment in favor of Tadlock and against EMC.  After filing an unsuccessful motion for rehearing, <u>see</u> Motion for Rehearing, Amendment of Judgment, Relief from Judgment, or New Trial (Doc. No. 1-9; Motion for Rehearing); Order Denying Motion for Rehearing, Amendment of Judgment, Relief from Judgment, or New Trial (Doc. No. 1-10), EMC appealed to this Court.

The issues raised in this appeal center around the purchase of a business and the operation of its finances.  The parties stipulated to a majority of the relevant facts.  <u>See generally</u> Stipulation.  On February 19, 2007, Tadlock and two others, William Hiscock and Joseph Rzeszotko, formed EMC for the purpose of purchasing a property maintenance company, Leonard's Painting & Maintenance, Inc. (Leonard's).  Stipulation ¶¶ 1-2.  The negotiated purchase price for Leonard's was $2,800,000, and EMC was able to obtain a small business loan from Wachovia SBA Lending, Inc. for $1,790,500 of that amount.  <u>Id.</u> ¶ 5; Joint Exhibits 2, 3; Transcript at 30-31, 225.  Prior to issuing the SBA loan, Wachovia

---

[2]     EMC also initially challenged additional amounts based on charges Tadlock made to EMC's credit card and his receipt of EMC's construction services as nondischargeable.  However, it dropped those claims at trial.  <u>See</u> Transcript at 401.

[3]     The record reflects that the evidentiary hearing lasted a full day, beginning at 9:30 a.m. and ending at approximately 7:30 p.m. on November 21, 2011.  <u>See</u> Transcript at 6, 429.

required an injection of at least $1,030,467.00 of equity capital into EMC "for acquisition of existing business and soft costs."  <u>See</u> Joint Exhibit 2 at 7 ¶ 4; <u>see also</u> Transcript at 32, 41-43, 119, 173.  As EMC's shareholders did not have that amount of money available, <u>see</u> Transcript at 37, 173, 264, the remaining funds primarily came from Sunseeker Investments, Inc. (Sunseeker), another company Tadlock and Rzeszotko owned together in equal shares, <u>see</u> Stipulation ¶ 11; Transcript at 266; Joint Exhibit 11.

Sunseeker transferred approximately $853,732.63 to EMC prior to the closing.  <u>See</u> Joint Exhibit 11.[4]  Hiscock contributed $209,000 to the closing, financed through a line of credit secured by his second home, and Tadlock contributed $100,000 using his own funds. <u>See</u> Transcript at 36-37, 266, 272.  Other than Rzeszotko's indirect contribution through his ownership in Sunseeker, he did not make any cash contributions to EMC.  <u>See</u> Transcript at 173-74, 267-68, 311.

On April 2, 2007, EMC closed on its purchase of the assets of Leonard's.  <u>See</u> Stipulation ¶ 4; Joint Exhibit 3.  At that time, Tadlock was EMC's president, Chief Financial Officer (CFO), and majority shareholder, with fifty-one percent of the outstanding shares. <u>See</u> Stipulation ¶ 7; Transcript at 36, 268-69, 288-89.  Hiscock was EMC's vice president,

---

[4]     Joint Exhibit 11 is a transaction log entitled "Sunseeker Investments Cash Infusion into Leonards Painting and Maintenance."  The parties agreed to the admissibility and authenticity of all of the Joint Exhibits.  <u>See</u> Transcript at 7.  Indeed, EMC states in its Initial Brief that it takes no issue with the bankruptcy court's findings of fact as to the total amounts Mr. Tadlock entered into the log.  <u>See</u> Initial Brief at 9-10.  However, in its Reply Brief, EMC states that "Joint Exhibit 11 was not authenticated as EMC's business record."  Reply Brief at 11.  EMC seems to be disputing the relevance of Joint Exhibit 11 as to EMC because its other shareholders, Rzeszotko and Hiscock, testified that they were not aware of the log until the relationship between the shareholders dissolved in July of 2008.  <u>See id.</u>  Based on EMC's arguments, the actual dollar amounts listed in the log do not appear to be in dispute; instead the dispute is over whether the log is evidence of EMC's knowledge of the transactions.  Accordingly, the Court relies on Joint Exhibit 11, as the bankruptcy court did, as to the dates and amounts of the transfers between Sunseeker and EMC.

5

holding thirty percent of EMC's shares, and Rzeszotko was EMC's secretary, holding nineteen percent of the company's outstanding shares. Stipulation ¶¶ 8-9; Transcript at 36, 174.

Following the closing, Sunseeker advanced additional funds to EMC to help cover operational costs or short-term payables because EMC did not have funds available in its bank account. See Stipulation ¶ 12; Joint Exhibit 11; Transcript at 281. The parties agree that these advances were loans as part of an open line of credit that Sunseeker extended to EMC. See Stipulation ¶ 12; Transcript at 46-48, 134-35, 137-38, 203, 215, 281-82, 286. However, the parties disagree about whether this agreement was verbal or written. Both Hiscock and Rzeszotko testified that the agreement made between themselves and Tadlock on behalf of EMC and Sunseeker was a verbal agreement. See Transcript at 135, 215. Tadlock, on the other hand, testified that Sunseeker would not have made the loans without a written agreement in place and submitted Joint Exhibit 44[5] as evidence of that loan agreement. See id. at 269-71. Hiscock and Rzeszotko both testified that they had not seen Joint Exhibit 44 until the initiation of legal proceedings surrounding this transaction. See id. at 114-17, 190-91. Tadlock signed the Note and the Addendum, dated April 1, 2007, on behalf of EMC, the Guaranty on behalf of himself as an individual, as well as the Commercial Security Agreement on behalf of both Sunseeker and EMC. See Joint Exhibit 44. Tadlock explained during his testimony that Joint Exhibit 44 was meant to cover

---

[5]     Joint Exhibit 44, which EMC also attached to its Initial Brief as Exhibit A, includes the Negotiable Commercial Promissory Note (the Note) between EMC and Sunseeker, Addendum 1: Line of Credit/Payment (the Addendum) setting out the financing and repayment terms, a Guaranty signed by Tadlock, and a Commercial Security Agreement granting Sunseeker a security interest in Tadlock's shares of EMC.

both the purchase of Leonard's and EMC's subsequent operation of the business.  See Transcript at 269-83.  On the other hand, Hiscock and Rzeszotko both testified that the loan did not cover the funds Sunseeker advanced prior to the closing; instead, the shareholders testified that this money was intended to be Tadlock's equity contribution, and Rzeszotko's contribution would be the conversion of his shares in Sunseeker into his shares of EMC.  See Transcript at 33-34, 173-74, 197-98.  Thus, among the central issues for the bankruptcy court to resolve was whether the funds advanced prior to closing were loaned to EMC or constituted Tadlock's equity contribution.

Relevant to that determination was the shareholders' interaction with Brian Leonard and Dan Butterworth, the co-founders of Leonard's.  See Stipulation ¶ 2.  EMC executed a promissory note to them in the amount of $700,000 to cover that amount of receivables due to Leonard's prior to the sale but not included in the $2.8 million asset purchase.  See id. ¶ 10; Transcript at 40; Joint Exhibit 4.  Initially, Leonard and Butterworth were to act as consultants for EMC for thirty days to assist in the transition of ownership and operations.  See Transcript at 37-38.  Deciding this length of time was insufficient, EMC later hired Leonard to remain as a consultant.  See Stipulation ¶ 10; Transcript at 38.  At one point near the end of 2007, EMC shareholders discussed the possibility of allowing Leonard and Butterworth to buy in to EMC.  See Stipulation ¶ 13.  Several e-mails were exchanged between the parties but they were ultimately unable to reach an agreement.  See id. ¶¶ 13-14; Transcript at 219.  One e-mail Leonard sent to Hiscock, Rzeszotko, and Tadlock delineated all of EMC's debts, which included, in addition to the debts to Wachovia, Leonard and Butterworth, and Hiscock, a balance owed to Sunseeker in the approximate

7

amount of $800,000 at an interest rate of thirteen percent.  <u>See</u> Joint Exhibit 6.  As of the date of the e-mail, December 15, 2007, Sunseeker had made post-closing advances in the amount of $201,913.80.  <u>See</u> Joint Exhibits 6, 11.  Despite the difference in loan balances, neither Hiscock nor Rzeszotko, both of whom responded to this e-mail, disputed the amount owed to Sunseeker.  <u>See</u> Joint Exhibit 7; Transcript at 139-40; 207-12.

All three shareholders testified that they all had access to the company books, although Tadlock was primarily responsible for balancing EMC's books and keeping track of its finances as the company's chief financial officer.  <u>See</u> Transcript at 18, 53, 130-31, 288-89.  Hiscock took a more physical role in the company, dividing his time evenly between the field and overseeing operations, e.g., insurance, employees, payments, and accounts payables.  <u>See</u> <u>id.</u> at 52-53; 289.[6]  On numerous occasions, while reviewing the company records, Hiscock testified that he felt that there was insufficient funds in EMC's bank account based on the money that was coming in, and questioned Tadlock as to his concerns.  <u>See</u> Transcript at 45-49, 54-55.  Hiscock further requested that Tadlock limit the amount of money going back to Sunseeker to $15,000 per month.  <u>See</u> <u>id.</u> at 55. According to Hiscock, in mid-2008, following a returned check for insufficient funds and a notice that EMC was in default on their SBA loan, <u>see</u> Joint Exhibits 8, 9; <u>see also</u> Stipulation ¶¶ 15-16, the relationship between Tadlock and the other two shareholders deteriorated, <u>see</u> <u>id.</u> at 64-81.  On or about September 10, 2008, Tadlock agreed to transfer two percent of his shares of EMC's stock to Hiscock, who was then named president of EMC.  Stipulation ¶

---

[6]      Rzeszotko was learning business operations under Hiscock and eventually began bringing in new business and supervising job sites.  <u>See</u> Transcript at 289-90.

17; Transcript at 81-84.[7]  The total amount of money Sunseeker transferred post closing, from April 3, 2007 to April 1, 2008, was $255,913.80.  See Joint Exhibit 11. During his tenure as president of EMC, Tadlock transferred $1,058,830.00 from EMC to Sunseeker. Stipulation ¶ 18; Joint Exhibit 11.  Not long after Tadlock's removal as president, on October 29, 2008, EMC filed suit against Tadlock and Sunseeker.  Stipulation ¶ 19; Transcript at 86-87, Joint Exhibit 12.  Subsequently, both Tadlock and Sunseeker filed for bankruptcy protection, Sunseeker filed separate adversary proceedings against Hiscock and Rzeszokto, and EMC filed the instant adversary proceeding.  See Stipulation ¶¶ 33-34, 41, 43-44.[8]

In filing the adversary proceeding, EMC sought a judgment against Tadlock declaring nondischargeable the amount Tadlock transferred to Sunseeker in repayment of those funds used to purchase Leonard's.  EMC argued at trial that this money was an equity contribution in exchange for Tadlock's shares in EMC.  Accordingly, EMC considered the money Tadlock transferred from Sunseeker to be misappropriated, and thus excepted from Tadlock's discharge pursuant to § 523(a)(4).  See Transcript at 406-416.  Additionally, EMC argued that, if the money was indeed a loan as Tadlock maintained, then Tadlock obtained the money by fraudulent misrepresentation or false pretenses because the other two shareholders of EMC, Rzeszotko and Hiscock, did not know the money was given as

---

[7]     The parties gave conflicting testimony as to the reason for the transfer.  Tadlock testified that he transferred two percent of his shares because he was becoming too busy to fulfill his role as the head of the company and because he wanted all decisions to be made by all three shareholders, rather than any one person with total decision making authority.  See Transcript at 316-318.

[8]     The bankruptcy court dismissed Sunskeeker's bankruptcy case on September 28, 2011, on its own motion.  See Stipulation ¶ 49.

a loan, and the money should thus be excepted from discharge pursuant to § 523(a)(2)(A).
See id. at 416-21.

The bankruptcy court rejected both of EMC's arguments and found, after considering the record, "that EMC and Sunseeker operated under an informal lending arrangement pursuant to which Sunseeker advanced funds to EMC to enable EMC to acquire and operate its business, and EMC repaid the advances periodically according to the financial need and capability of both Sunseeker and EMC." Opinion at 13. In addition, the bankruptcy court found that these transactions were accomplished with EMC and its principals' knowledge and acquiescence. Id. In the Opinion, the bankruptcy court listed the transfers made to and from Sunseeker at various times, first for the acquisition of Leonard's, and later for EMC's business operations, and explained the evidence upon which it relied to conclude that the payments were loans, as well as that which supported its findings as to Hiscock and Rzeszotko's "knowledge and acquiescence" of these transactions. See id. at 13-18. Because the bankruptcy court concluded that the transfers from EMC to Sunseeker were repayments of a loan, Tadlock did not fraudulently appropriate the funds and the debt was not excepted from discharge pursuant to § 523(a)(4). Id. at 18. Additionally, the bankruptcy court found that EMC had not proven that Tadlock obtained funds by misrepresentation or false pretenses, as EMC was unable to prove its contention that Tadlock represented to Hiscock and Rzeszotko that the funds were Tadlock's shareholder equity rather than a loan. See id. at 6-10. As the bankruptcy court explained, "EMC did not establish any representation by the Debtor that the funds transferred at closing were anything other than the proceeds of a loan from Sunseeker."

10

Id. at 8.  Based on these findings and conclusions, the bankruptcy court entered Judgment in favor of Tadlock and against EMC.  See Judgment.  EMC then appealed to this Court.

**III.     Summary of Arguments**

EMC raises three claims of error in this appeal.  See generally Initial Brief.  First, it argues that the bankruptcy court erred in finding that the parties had an informal lending agreement when Tadlock testified at the hearing that the parties had a formal agreement memorialized in Joint Exhibit 44.  See Initial Brief at 3, 11-17.  Next, EMC contends that the bankruptcy court improperly shifted the burden to it to disprove Tadlock's affirmative defenses, namely waiver, estoppel, acquiescence, and ratification, and erred in finding that Hiscock and Rzeszotko knew about the entirety of the lending arrangement.  See id. at 3-4, 18-26.  Finally, although the bankruptcy court found that EMC did not prove that Tadlock made a misrepresentation, EMC asserts that the court failed to consider whether Tadlock obtained funds under false pretenses by failing to inform EMC's other shareholders that the original funds advanced prior to closing were a loan.  See id. at 4, 26-27.

In its Answer Brief, Tadlock addresses each of these arguments in turn, responding first that the bankruptcy court's finding of an informal lending agreement is consistent with EMC's position that there was no written lending agreement and the evidence at trial that Sunseeker lent EMC money prior to closing on the purchase of Leonard's.  See Answer Brief at 17-18.  Next, Tadlock argues that there is ample evidence that Hiscock and Rzesztoko were aware that the pre-closing funds transferred to EMC were part of a loan, and that in so finding, the bankruptcy court never reached Tadlock's asserted affirmative

defenses.[9]  See id. at 18-19.   Similarly, Tadlock also contends that there is sufficient

evidence supporting the bankruptcy court's conclusion that Tadlock did not misrepresent

that nature of the funds to Hiscock or Rzeszotko, particularly since both shareholders

testified that they too expected their equity contributions to be repaid, and the bankruptcy

court found that the shareholders knew that Tadlock had been making regular payments

on the Sunseeker loan.  See id. at 18, 32-34.

## IV.     Discussion

In  seeking  to  have  certain  funds  Tadlock  transferred  from  EMC  to  Sunseeker

declared non-dischargeable, EMC relied upon 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4).

"A central purpose of the bankruptcy code is to provide the 'honest but unfortunate debtor'

with a fresh start."  Counsel Fin. Servs. LLC v. Wood, No. 2:11-cv-1051-RDP, 2014 WL

1155580, at *4 (N.D. Ala. Mar. 20, 2014) (quoting In re Miller, 39 F.3d 301, 304 (11th Cir.

1994)).  Section 523 "provides carefully drawn exceptions to this general rule, which must

be construed strictly against the creditor and liberally in favor of the debtor 'to give effect

to the fresh start policy of the Bankruptcy Code.'"  In re Gross, No. 09-88462, 2011 WL

3881015, at *4 (Bankr. N.D. Ga. June 10, 2011) (quoting In re Walker, 48 F.3d 1161, 1164-

65 (11th Cir. 1995)).  With respect to EMC's claims, pursuant to subsection (a)(2)(A), an

individual debtor  may  not  receive  a  discharge  from  any  debt  for  money,  property  or

services obtained by "false pretenses, a false representation, or actual fraud, other than a

---

[9]        Tadlock separates this argument into two separate issues: whether the bankruptcy court
erred in making the factual finding that the other shareholders of EMC were aware that the transfer was
a loan and whether the bankruptcy court improperly shifted the burden to EMC to disprove Tadlock's
affirmative defenses of ratification, estoppel, and waiver.  See Answer Brief at 1, 18-19.  However, the
Court addresses EMC's argument in the manner EMC raised it, as a single issue.

statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).  In the Eleventh Circuit, a claim under this subsection requires proof of the traditional elements of common law fraud.  In re Wood, 245 F. App'x 916, 917 (11th Cir. 2007).  As such, to establish non-dischargeability under § 523(a)(2)(A), a creditor must show:  "(1) the debtor made a false representation with the intention of deceiving the creditor; (2) the creditor relied on the false representation; (3) the reliance was justified; and (4) the creditor sustained a loss as a result of the false representation."  Id. at 917-18.

Subsection (a)(4) similarly excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).  To establish non-dischargeability under this section, a party must establish either (1) that the defendant (i) committed fraud or defalcation (ii) while acting in a fiduciary capacity, or (2) that the defendant is guilty of larceny or embezzlement.  In re Kelley, 84 B.R. 225, 228 (Bankr. M.D. Fla. 1988).  In this appeal, only embezzlement is advanced as a basis for finding an exception to discharge under § 523(a)(4).[10]  Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come."  In re Weber, 892 F.2d 534, 538 (7th Cir. 1989) (quoting Moore v. United States, 160 U.S. 268, 269 (1895)).  A claim of nondischargeability under § 523(a)(4) for embezzlement requires proof of two elements: (1) that "a debtor appropriated funds to his or her benefit," and (2) "that the debtor did so with fraudulent

---

[10] In its Complaint, EMC also alleges defalcation while acting in a fiduciary capacity and larceny.  See Complaint at 5-6.  However, EMC only raises issues as to its embezzlement claim on appeal.  See generally Initial Brief; Reply Brief.

intent or deceit." <u>In re Lam</u>, No. 06-68805-MGD, 2008 WL 7842072, at *3 (Bankr. N.D. Ga. Mar. 27, 2008).  "An intent to defraud is defined as 'an intention to deceive another person, and to induce such other person, in reliance upon such deception to assume, create, transfer, alter or terminate a right, obligation, or power with reference to property.'" <u>In re Edelson</u>, No. 08-77595-BEM, 2013 WL 5145714, at *6 (Bankr. N.D. Ga. July 3, 2013) (quoting <u>In re Cook</u>, 141 B.R. 777, 781 (Bankr. M.D. Ga. 1992)).  Because intent is a state of mind, the Court may interpret the debtor's conduct and must necessarily take into account all the circumstances in order to determine whether a debtor had the requisite fraudulent intent.  <u>Id.</u>  Notably, EMC, as the party objecting to discharge, has the burden of proving each element of the dischargeability exceptions upon which it relies by a preponderance of the evidence.  <u>See</u> <u>Counsel Fin. Servs., LLC</u>, 2014 WL 1155580, at *4 (citing <u>Grogan v. Garner</u>, 498 U.S. 279, 287 (1991)).

Central to both of EMC's claims of nondischargeability is the issue of the nature of the funds transferred prior to closing from Sunseeker to EMC.  If, as Tadlock contends and the bankruptcy court found, the funds were a loan, then Tadlock did not misappropriate the funds he transferred from EMC in repayment.  If, however, as EMC contends, the initial transfer of funds was Tadlock's equity contribution to EMC and the consideration for his shares, then Tadlock's transfer of funds may have been an embezzlement, depending on whether Tadlock made the transfers with fraudulent intent.  For EMC's misrepresentation claim to succeed, the funds must have been a loan and Tadlock must have told Hiscock and Rzeszotko otherwise, or as EMC contends on appeal, Tadlock must have given them that impression.  Given the fact that EMC's latter claim appears to be an alternative

14

argument dependent on the characterization of the pre-closing funds coming from Sunseeker, the Court addresses the issue of the nature of the funds first.

### A. Informal Lending Agreement Finding

Relying on Joint Exhibit 44, EMC argues that the terms of the loan agreement contained in these documents "are clear and unambiguous" because the Note and Addendum indicate that any loans from Sunseeker to EMC would occur after the closing, thus prospectively from the signing of the agreement on April 1, 2007. Initial Brief at 12-17. In light of the terms of Joint Exhibit 44, EMC argues that the bankruptcy court erred in finding that EMC had an informal lending arrangement with Sunseeker prior to closing that enabled it to acquire Leonard's. See id. at 17 (quoting Opinion at 13). EMC argues instead that "[t]he evidence established that neither Sunseeker (and Mr. Tadlock) nor EMC (and its Shareholders, including Mr. Tadlock) contemplated that the $800,000.00 in pre-Transaction contributions as part of any sort of lending arrangement between Sunseeker and EMC." Id. In response, Tadlock argues that the bankruptcy court did not rely on Joint Exhibit 44 in finding the existence of a lending arrangement, and did not accept either side's position entirely as to nature of that lending arrangement. See Answer Brief at 21. He further argues that this Court cannot ignore the evidence relied upon by the bankruptcy court to reverse its sound factual findings. See id. at 21-26.

There was no dispute at trial that, post-closing, EMC did not have sufficient cash to operate, so it made an agreement with Sunseeker to borrow money and repay it with interest. In this regard, Hiscock and Rzeszotko testified that they had never seen the written document, Joint Exhibit 44, but had a verbal agreement. Tadlock, on the other

15

hand, testified that Joint Exhibit 44 represented the formal agreement because transacting business based on a wink or a handshake "was not the way that Sunseeker does business." See Transcript at 270. He suggested that Joint Exhibit 44 was intended to cover money lent to EMC both before and after closing. See id. at 266, 270-71, 387-88. In reviewing Exhibit 44, the bankruptcy court found that it was inconclusive as evidence of Tadlock's misrepresentation of the nature of the funds because there was no evidence of when it was drafted and signed, and there was conflicting evidence about whether Hiscock and Rzeszotko knew about the documents when they were prepared. See Opinion at 9. Having discounted the evidentiary value of Joint Exhibit 44, the bankruptcy court did not refer to those documents in its analysis of the companies' lending relationship. See id. at 13-18. Without relying on that evidence, the bankruptcy court found "that EMC and Sunseeker operated under an informal lending arrangement pursuant to which Sunseeker advanced funds to EMC to enable EMC to acquire and operate its business, and EMC repaid the advances periodically according to the financial need and capability of both Sunseeker and EMC." Id. at 13. Neither party disputed that what the bankruptcy court deemed "the operating loan" was indeed a loan, but EMC continues to challenge the existence of "the acquisition loan" on appeal.

In its decision, the bankruptcy court set forth the basis for its finding that the more than $800,000 Sunseeker advanced to EMC for the purchase of Leonard's was a loan. Primarily, the bankruptcy court pointed to the timing, amounts, and resulting interest of each of the transfers. In late March of 2007, Joint Exhibit 11 (the transaction log) reflects that Sunseeker made three separate "transfers to closing" totaling $853,732.63. See

16

Opinion at 13.  EMC purchased Leonard's assets several days later on April 2, 2007.  See

id.  After a single advance to EMC made on April 3, 2007, EMC owed $10,905.74 in interest

by May 1, 2007.  See id. at 13-14 (citing Joint Exhibit 11).  Shortly thereafter, EMC made

its first payment to Sunseeker of $15,000 on May 3, 2007, and its second payment of

$5,500 on May 18, 2007.  See id.  The total of these two payments, $20,500, was greater

than the single advance made post-closing.  See id. at 14.  Further, the bankruptcy court

relied on Tadlock's testimony that Sunseeker loaned EMC the difference between the

purchase price and the amounts obtained from other sources (i.e., the SBA loan, the

money from Hiscock's line of credit and Tadlock's contribution).  See id. at 14 (citing

Transcript at 266, 339-40).  Additionally, the bankruptcy court was persuaded by Leonard's

December 15th e-mail to all of EMC's shareholders listing the amount of debt EMC owed

Sunseeker as $800,000.  See id. (citing Joint Exhibit 6).  At that time, Sunseeker had

advanced only $201,913.80 post-closing, yet neither Hiscock nor Rzeszotko disputed the

amount of the debt.  See id. (citing Joint Exhibit 7).  Lastly, the bankruptcy court looked to

EMC's 2007 tax return, which listed a loan from Sunseeker in the amount of $652,691.  See

id. at 14.[11]  This evidence soundly supports the bankruptcy court's finding that the funds

Sunseeker advanced to EMC were a loan and EMC consistently treated it as such.

Despite the above evidence, EMC argues that the bankruptcy court erred in

discounting Joint Exhibit 44 in making its finding.  See Initial Brief at 11-17.  Relying on the

---

[11]     According to Tadlock's testimony, the information to prepare the tax return came from
EMC's Quickbooks business records.  See Opinion at 14 (citing Tadlock's Exhibit 3, Transcript 206, 292-
96).

Note's language, EMC argues that it is apparent that the document was meant to apply after closing, and is therefore consistent with EMC's position.  See id. at 16-17.  EMC appears to contend that because this loan agreement did not apply to the pre-closing funds, that means that the money advanced prior to the agreement was not a loan but an equity contribution.  Neither the evidence nor logic support that inference.  Although Tadlock testified to the contrary, the bankruptcy court found that the Note did not cover the pre-closing transfers.  However, the fact that Tadlock did not reduce to writing the intention to fund EMC by way of a loan from Sunseeker does not mean that those funds necessarily became an equity contribution.

Tadlock consistently testified that all of the funds Sunseeker transferred to EMC were intended to be repaid, and the bankruptcy court found this testimony to be credible.  In its Reply Brief, EMC states "[t]he Bankruptcy Court made no creditability [sic] determinations in its Findings of Fact and Conclusions of Law (the "FFCL").  The parties' veracity was not an issue at trial."  Reply at 1.  This assertion is incorrect.  While the bankruptcy court did not expressly state its belief or disbelief in the testimony of each witness, Tadlock's testimony that Sunseeker loaned EMC the remaining funds necessary to purchase Leonard's conflicts with Hiscock and Rzeszotko's testimony that the funds from Sunseeker were intended to be an equity contribution.  The bankruptcy court could not have relied on Tadlock's testimony to the exclusion of Hiscock and Rzeszotko's testimony

without making a credibility determination.[12]  Upon review of the record the Court finds

ample support for the bankruptcy court's determination that Tadlock's testimony, along with

other evidence, established that the pre-closing funds from Sunseeker were part of an

informal lending agreement.  As such, this Court cannot conclude that the bankruptcy

court's factual finding was clear error.  See Anderson, 470 U.S. at 575.  The bankruptcy

court, as the trial court, is in the position to judge "the variations in demeanor and tone of

voice that bear so heavily on the listener's understanding of and belief in what is said."  Id.

Based on the bankruptcy court's credibility determinations and review of the other

evidence, the court found that the pre-closing funds were always intended to be repaid.

The evidence in the record is sufficient to support this finding.  Therefore, EMC has not met

its burden on appeal to show clear error as to the nature of the funds and EMC's

embezzlement claim.

　　　　EMC's argument as to the nature of the funds and Joint Exhibit 44 also relates to its

§ 523(a)(2)(A) misrepresentation claim because EMC asserts that the bankruptcy court

must have considered the Note in concluding that the funds advanced prior to closing were

not anything other than loan proceeds.  See Initial Brief at 12 (quoting Opinion at 8).

---

　　　　[12]　　　The Court notes that Hiscock and Rzeszotko's own testimony was not entirely consistent.  Hiscock testified that his contribution came from his line of credit, but he did not intend it to be repaid.  See Transcript at 125.  Despite this statement, Hiscock admitted that EMC's ledger, Joint Exhibit 43, reflected that EMC made a $5,000 loan payment to him on May 18, 2007.  See Transcript 125-26 ("[That money] went to me for the purpose of allowing me to cover the expenses incurred by the line of credit that I took out prior to closing.").  There were two additional loan payments to Hiscock for $2,500 each on August 21, 2007 and September 21, 2007, which were made for the same purpose, to repay himself for his capital injection.  See id. at 127-28. Despite understanding that capital contributions are not supposed to be repaid, Hiscock testified that he repaid himself anyway at Tadlock's suggestion and against his better judgment.  See id. at 128-29.  There was also inconsistent testimony from Rzeszotko that he liquidated his shares of Sunseeker but yet continued to receive statements as a Sunseeker shareholder.  See id. at 197-201.

However, in the cited portion of the Opinion, the bankruptcy court was discussing EMC's failure to establish that Tadlock made any representations to EMC that would lead it to believe "that the funds transferred at closing were anything other than the proceeds of a loan from Sunseeker."  Opinion at 8.  The bankruptcy court found an absence of any evidence that Tadlock ever told either Rzeszotko and Hiscock that the money was an equity injection that would not be repaid.  See id. at 8-9.  In reviewing the testimony, the bankruptcy court noted that Hiscock's testimony was limited to the fact that the three shareholders had to bring "$1 million to the deal" and their contributions were to be equity injections into EMC.  See id. at 9 (citing Transcript at 32-34, 118-119).  Tadlock personally contributed $100,000 as a shareholder, but Sunseeker, as another company, could not own part of EMC.  See Transcript at 266, 370.  Therefore, the bankruptcy court identified a lack of evidence that Tadlock ever said that the funds from Sunseeker were Tadlock's equity capital.  See Opinion at 9-10.  Based on the bankruptcy court's findings, which the evidence sufficiently supported, the Opinion is due to be affirmed to the extent it found that the pre-closing funds were part of an informal lending agreement.

### B.   Shareholder Knowledge Finding

In addition to the bankruptcy court's finding that an informal lending agreement existed, EMC asks this Court to reverse the finding that EMC's shareholders Hiscock and Rzeszotko knew about the arrangement.  Specifically, the bankruptcy court found that "the lending arrangement between Sunseeker and EMC was carried out with the knowledge and acquiescence of EMC's shareholders and officers."  Opinion at 16.  EMC contends that this finding is erroneous because the evidence conclusively established that only Tadlock

20

facilitated the transactions between the two companies and Hiscock and Rzeszotko were completely unaware of any pre-closing loan repayment.  See Initial Brief at 18.  Citing Florida law, EMC argues that its shareholders, other than Tadlock, could not have known that the more than $800,000 transferred from Sunseeker prior to closing was a loan because Tadlock was required to pay for his shares, and could not do so with money that EMC would eventually have to pay back.  See id. at 18-21.

In response, Tadlock explains that EMC is simply rearguing their case rather than addressing the bankruptcy court's factual finding.  See Answer Brief at 27.  He further argues that Florida law permits the issuance of stock for tangible and intangible value, including personal services.  See id. at 28 (citing Fla. Stat. § 607.0621).  Tadlock personally contributed $100,000 and did not take a salary for his role as EMC's president.  Id. (citing Transcript at 266, 304).  Therefore, Tadlock concludes that he did provide consideration for his shares of stock, more so than Hiscock, who took out a $200,000 loan he expected to be repaid and Rzeszotko who contributed no money to the transaction.  See id. at 28-29.

Also relating to the issue of knowledge is EMC's contention that the bankruptcy court must have concluded that Tadlock has embezzled the funds he transferred to Sunseeker and then turned to Tadlock's affirmative defenses without shifting the burden to him to establish waiver, ratification, and estoppel.  See Initial Brief at 23-25.  However, EMC's argument is based on a false premise—the bankruptcy court never determined that Tadlock embezzled funds.  Instead, the bankruptcy court looked to the fact that Tadlock never hid the transfers from either Hiscock or Rzeszotko and the fact that neither shareholder disputed that they had access to the books to determine Tadlock's intent.  See

21

Opinion at 16-17 ("[I]nformation regarding the transfers was available in EMC's books and records, and the shareholders had the opportunity and ability to examine the books to determine the nature and extent of the transfers.").

"[T]he showing of fraudulent intent which is a prerequisite to a finding of embezzlement under Section 523(a)(4) may be negated by a showing that the defendant used such funds openly and without concealment."[13]   In re Kelley, 84 B.R. at 231; see also In re Edelson, 2013 WL 5145714, at *6 ("Concealment is frequently used by the courts as evidence of fraudulent intent.").   The evidence at trial showed that EMC's shareholders were aware of the lending arrangement and Tadlock's repayments to Sunseeker from the outset.   Indeed, Hiscock testified that nearly from the start of the relationship between the two companies, he was concerned about the amount of money going out of EMC and into Sunseeker, and later informed Tadlock that he needed to decrease or restrict the payments.   See Transcript at 45-49 ("I felt that we were profitable on a weekly and a monthly basis, and I felt that our bank account should be on an increasing trend, and it

---

[13]        In his Answer Brief, Tadlock refers to this proposition as the "knowledgeable acquiescence" doctrine.   See Answer Brief at 35 (citing Weber, 892 F.2d at 539).   EMC responds that the bankruptcy court focused on the affirmative defense of ratification rather than knowledgeable acquiescence, and that in any event the bankruptcy court erred because it was Tadlock's burden to show that EMC's other shareholders knew of all the material facts.   See Reply Brief at 6-7.   Moreover, EMC contends that those cases dealing with "knowledgeable acquiescence" as relevant to whether the debtor had fraudulent intent were all decided prior to the Supreme Court's decision in Grogan lowering the burden of proof as to § 523(a) cases from clear and convincing evidence to a preponderance of the evidence.   See id. at 11-12.   The bankruptcy court did not refer specifically to the doctrine of knowledgeable acquiescence, or cite any cases that refer to it, but rather, as discussed above, determined based on the overall circumstances of the transfers that they did not constitute embezzlement.   Indeed, the bankruptcy court stated: "The transfers from EMC to Sunseeker were repayments of a loan, and do not constitute a fraudulent appropriation of EMC's funds by the Debtor. EMC did not satisfy its burden of proving that the funds were embezzled from EMC by the Debtor." See Opinion at 18.   Therefore, the Court need not address further EMC's argument regarding the effect of the change in the standard of proof on the applicability of the doctrine of knowledgeable acquiescence.

wasn't. It was just stabilized at what I would consider an anemic level."); 54 ("I continued to express my concern over the impact of not having what I considered to be enough money in the bank to Mr. Tadlock."); 55 ("I proposed that Mr. Tadlock limit the outflow cash from Enterprise Maintenance and Contracting to Sunseeker Investments to $15,000 a month. I simply picked that number as an arbitrary number, because I felt that it would satisfy Mr. Tadlock's needs as well as the company's needs."); 146 (explaining that his contribution was higher than he expected, he could not make the loan payments, and he accepted Tadlock's suggestion to pay the loan out of company funds even though he "didn't feel comfortable with it from the start"). Based on the openness of the transactions and the circumstances of the transactions (i.e., the timing and amounts), there was sufficient evidence for the bankruptcy court to determine that Tadlock had not misappropriated EMC's funds with fraudulent intent. See Gross, 2011 WL 3881015, at *6 ("[T]he Court may infer fraudulent intent based on the circumstances, but if there is room for an inference of honest intent, the question of nondischargeability must be resolved in the debtor's favor.") (internal quotation omitted). Although the bankruptcy court noted that Hiscock and Rzeszotko testified that they thought these transfers were related only to post-closing loans for operating expenses, it rejected this testimony.[14] See Opinion at 17. Further, because

---

[14] EMC also argues that the bankruptcy court failed to consider the evidence that EMC did not ratify Tadlock's actions because it filed suit against him. See Initial Brief at 23; Joint Exhibit 12. EMC states, "In fact, once the breadth and scope of the transfers were discovered by Mr. Hiscock, as the evidence revealed, Mr. Tadlock was fired, sued, and Mr. Tadlock and EMC (and the Shareholders) have been engaged in litigation ever since." Initial Brief at 23. EMC ignores the fact that Tadlock was making the transfers from EMC to Sunseeker as early as May 3, 2007, and EMC did not file suit against Tadlock until October 29, 2008. See Joint Exhibits 11, 12. More importantly, the bankruptcy court did not accept Hiscock and Rzeszotko's testimony that they did not know that these transfers were repayments for Sunseeker advances made before and after closing. Evidence of Hiscock and Rzeszotko's actions after their relationship with Tadlock dissipated is not sufficient to undermine the bankruptcy court's factual

the bankruptcy court found that EMC had not proven embezzlement, it did not reach Tadlock's affirmative defenses.  Accordingly, EMC's argument that the bankruptcy court shifted the burden to EMC to disprove Tadlock's affirmative defenses is without merit.

### C.    Fraud by Omission

The bankruptcy court also determined that EMC failed to prove that Tadlock misrepresented to Hiscock and Rzeszotko that the funds from Sunseeker was an equity contribution rather than a loan.  As discussed above, this finding was not clearly erroneous. As an apparent alternative to this argument, EMC argues that the bankruptcy court improperly failed to consider whether Tadlock made an implied representation at the closing, which required a $1 million equity contribution, when he did not speak up and inform the other shareholders that $800,000 of the funds injected into EMC were part of a loan instead.  See Initial Brief at 26-27; Reply Brief at 8-11.  "False pretenses may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts, work, symbol, or token calculated and intended to deceive. . . . Silence or concealment as to a material fact can constitute false pretenses." In re Wood, 245 F. App'x at 918 (quoting In re Gilmore, 221 B.R. 864, 872 (Bankr. N.D. Ala. 1998)).

With regard to this issue, EMC contends that "what the evidence did show (and what the Bankruptcy Court ultimately found) was that Mr. Tadlock omitted a very important and material fact from any and all discussions leading up to and after the Transaction was

---

findings regarding their knowledge in light of the bankruptcy's court's credibility determinations and the evidence that supports its conclusions.

consummated: THE MONEY CONTRIBUTED WAS ACTUALLY EMC'S OWN MONEY BORROWED FROM SUNSEEKER." Initial Brief at 26 (emphasis in original). EMC then argues that this omission prevented Hiscock and Rzeszotko from learning that the shares of EMC would be "immediately diluted." Id. at 27. However, EMC again ignores the fact that the bankruptcy court concluded, based on a review of the evidence, that all of the shareholders knew that the money Sunseeker advanced would be repaid. Thus, EMC's contention that "Tadlock's equity injection was actually coming from EMC itself, in the form of a clandestine loan" and that the bankruptcy cou0rt did not consider evidence that Tadlock did not disclose the nature of the funds is simply not correct. See id. at 27. The bankruptcy court considered the nature of the funds and found that the shareholders knew from the beginning that they did not have the funds to put $1 million into EMC. Instead, Rzeszotko and Tadlock borrowed the remaining money from Sunseeker, and all three shareholders knew this.

EMC's request that this Court remand the case is denied, as no remand is warranted. It is apparent from the bankruptcy court's findings that EMC did not prove its § 523(a)(2)(A) misrepresentation claim. EMC has not identified any error in the Opinion as to either the misrepresentation or the embezzlement claims, and the bankruptcy court's Judgment is due to be affirmed in its entirety.

**V.    Frivolousness of Appeal**

Having found that the bankruptcy court's Judgment is due to be affirmed, the Court must next consider whether the instant appeal was frivolous such that the Court should impose sanctions against EMC, as Tadlock requests in his Motion. Pursuant to Rule 8020,

25

"the bankruptcy equivalent of Rule 38 of the Federal Rules of Appellate Procedure," In re Creative Desperation Inc., 443 F. App'x 399, 401 (11th Cir. 2011), upon finding that a bankruptcy appeal is frivolous, the Court "may, after a separately filed motion or notice from the district court or bankruptcy appellate panel and reasonable opportunity to respond, award just damages and single or double costs to the appellee." Fed. R. Bankr. P. 8020. An appeal is frivolous if "the result is obvious" or "the appellant's argument is wholly without merit." Steffen v. Berman, No. 8:09-cv-1953-T-RAL, 2010 WL 2293235, at *1 (M.D. Fla. June 7, 2010); see also In re Generes, 69 F.3d 821, 828 (7th Cir. 1995) ("An appeal is frivolous when 'the result is foreordained by the lack of substance to the appellant's arguments.'"). Courts in this Circuit have imposed sanctions "against appellants who raise 'clearly frivolous claims' in the face of established law and clear facts." Farese v. Scherer, 342 F.3d 1223, 1232 (11th Cir. 2003) (quoting Misabec Mercantile, Inc. De Panama v. Donaldson, Lufkin & Jenrette ACLI Futures, Inc., 853 F.2d 834, 841 (11th Cir. 1988)); see also In re Hussey, 307 F. App'x 398, 399 (11th Cir. 2009) (affirming sanctions for appeal taken without legal or factual support).  In determining whether an appeal is frivolous, courts often look to such factors as whether the appellant was acting in bad faith or whether the appellant's argument properly addresses the issues on appeal, "fails to support the issues on appeal; fails to cite any authority; cites inapplicable authority; makes unsubstantiated factual assertions; makes bare legal conclusions; or, misrepresents the record." In re Land Resource, LLC, No. 6:12-cv-961-Orl-37, 2013 WL 950690, at *1 (M.D. Fla. Mar. 12, 2013) (quoting In re Maloni, 282 B.R. 727, 734 (B.A.P. 1st Cir. 2002)).

Although the Court has determined that the bankruptcy court's decision is due to be affirmed, EMC's unsuccessful arguments were not patently frivolous or wholly without merit. See Steffen, 2010 WL 2293235, at *1. Indeed, to award sanctions in a case such as this could have the unintended effect of discouraging appeals involving credibility determinations. See In re Desmarais, No. 12-80426-CIV, 2012 WL 3779021, at *5 (S.D. Fla. Aug. 31, 2012) ("Appellant had a good faith basis to seek appellate review of that factual determination which was on a central issue. To hold otherwise would impose a chilling effect on any losing party seeking appellate review of an adverse factual determination by a lower court."). Accordingly, Tadlock's Motion seeking sanctions is due to be denied.

## VI.    Conclusion

Accordingly, it is hereby **ORDERED**:

1.      The bankruptcy court's Findings of Fact, Conclusions of Law, and Memorandum Opinion (Doc. No. 1-3) and Final Judgment (Doc. No. 1-4) dated March 22, 2012, are **AFFIRMED**.

2.      Appellee's Motion for Damages and Costs for Frivolous Appeal (Doc. No. 17) is **DENIED**.

3.      The Clerk of the Court is directed to transmit a certified copy of this Order to the Clerk of the bankruptcy Court.

4.      The Clerk of the Court is further directed to enter judgment consistent with this Order, close this case, and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 30th day of September, 2014.

MARCIA MORALES HOWARD
United States District Judge

lc16
Copies to:
Counsel of Record

28